Viveiros v. SSA                    CV-02-255-B    04/05/03

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE

**David Viveiros**

    **v.**                                Civil No. 02-255-B
                                         Opinion NO. 2003 DNH 058

**Jo Anne Barnhart,**
**Commissioner of Social Security**
**Administration**


### MEMORANDUM AND ORDER

On February 23, 2000, David Viveiros filed an application with the Social Security Administration ("SSA") for Supplemental Security Income ("SSI"). Viveiros alleges that his disability began on October 29, 1999 as a result of multiple knee surgeries and a back injury. The SSA denied Viveiros's application on December 6, 2000. Viveiros filed a new application for benefits and requested a hearing before an Administrative Law Judge ("ALJ") without requesting reconsideration on the initial decision. A hearing was held on August 23, 2001 before ALJ Douglas Hoban. ALJ Hoban determined on March 5, 2002 that Viveiros was not disabled within the meaning of the Social Security Act (the

"Act"). See 42 U.S.C. § 1382 (1992 & Supp. 2002). Viveiros then asked the Appeals Council to review the ALJ's decision. The Appeals Council declined to do so and, pursuant to 42 U.S.C. § 405(g) (1991 & Supp. 2002), Viveiros filed this civil action seeking judicial review of the denial of his application.

Viveiros argues that the ALJ's denial of benefits is not supported by substantial evidence or adequate findings. Among other things, he argues that the ALJ failed to present the correct hypothetical questions to the vocational expert ("VE").

## I.  BACKGROUND[1]

### A.  Education and Work History

Viveiros was thirty-four years old when he filed his application for SSI. Viveiros has a tenth grade education and worked primarily in pipe line construction. He also worked as a general laborer doing weatherproofing. (Tr. 55). After making his first filing in support of his application, he worked in packaging for a door and window company for less than two months.

_____

[1]  Unless otherwise noted, the background facts are taken from the Joint Statement of Material Facts (Doc. No. 13) submitted by the parties.

(Tr. 40). He left his position because of his knee problems. From May 2001 until August 2001, Viveiros worked as a flag person during road construction. (Tr. 43). He left because he was unable to perform his duties.

**B. Medical Evidence**

Beginning in 1996, Viveiros sought treatment from William Spina, M.D. at Weeks Memorial Hospital ("Weeks") for knee pain resulting from a prior work accident. Prior to moving to New Hampshire and seeking treatment from Dr. Spina, Viveiros had already undergone four surgeries on his right knee. In a report dated April 14, 1997, Dr. Spina opined that a diagnostic procedure was, once again, necessary because Viveiros's right knee was swollen and repeatedly had given out on him. Viveiros underwent arthroscopic debridement of his right knee.

Viveiros returned to Weeks in May 1998 and was examined by Jeffrey Johnson, M.D. Viveiros had injured his right knee after falling through a bridge. Dr. Johnson recommended Viveiros wear a knee immobilizer and crutches. In September 1998, Viveiros returned to Dr. Johnson after falling onto a wood pile and injuring his back. An x-ray examination was within normal

limits. Viveiros was placed on Demerol and Phenergan for relief of pain.

In November 1999, Viveiros visited Dr. Spina complaining of knee pain and swelling. He stated his left knee would catch and give out. Dr. Spina opined that Viveiros had degenerative arthritis. Viveiros underwent arthroscopic debridement of his left knee later that same month. In December of 1999, Dr. Spina found a golf-ball size lump on Viveiros's left knee which he opined was a synovial[2] fluid leak. Viveiros was subsequently prescribed Celebrex and Vicodin for swelling and pain.

In May 2000, Viveiros fell in a pit, injured his back and began to develop spasms. He sought treatment at the Upper Connecticut Valley Hospital. Marvin Kendall, M.D., examined Viveiros and opined that he had a contusion to his lower back. Two days later, Viveiros returned to Connecticut Valley Hospital complaining of severe back pain. Viveiros was examined by Sharon Curtis, M.D. Dr. Curtis furnished Viveiros with Motrin, Valium, and Vicodin. She opined that Viveiros had low back strain and

---

[2] A clear fluid, the main function of which is to serve as a lubricant in a joint, tendon sheath, or bursa. Stedman's, p. 689.

noted severe muscle spasms.

Viveiros sought treatment during this same period from Dr. Spina for back spasms and pain. Dr. Spina found him "unfit to work" due to his injury. Dr. Spina also opined that Viveiros had a soft tissue mass in this lower back and osteoarthritis of both knees. Dr. Spina recommended that Viveiros receive an orthopedic consult. On August 3, 2000, Viveiros visited Gerrit Groen, M.D. for the recommended consultation. Dr. Groen noted that Viveiros should not engage in heavy work and should "get going" with vocational rehabilitation. (Tr. 241). Dr. Groen noted that Viveiros should be fitted for a brace for his right leg. In October 2000, Dr. Spina, once again, performed arthroscopy on Viveiros's right knee.

C. **Treating Physician's Opinion**[3]

In physician notes from March 8, 2001, Dr. Spina noted Viveiros's complaints of severe knee pain and his claim that he was unable to walk any distance. (Tr. 244). Dr. Spina opined that Viveiros's knee symptoms limited his work capacity and that,

_____

[3] Dr. Spina never completed an RFC assessment for Viveiros. As such, Dr. Spina's specific opinions as to Vieveiros's limitation exist only in the form physician notes and letters to Vieveiros's attorney.

as a result, he would have difficulty with both "sedentary work and physical labor." (Tr. 244).

In a letter dated October 22, 2001, from Dr. Spina to Viveiros's attorney, Dr. Spina discussed the possibility of Viveiros securing SSI. He opined that while Viveiros had early onset degenerative arthritis, "the problem with David and Social Security is that he is a very young and intelligent young man. He is an ideal candidate for Vocational Rehabilitation and job retraining in to a sedentary occupation. Perhaps even a career as a driver of some type." (Tr. 243).

D. **New Hampshire Disability Determination Services ("DDS") RFC Determination**

On November 29, 2000, DDS non-physician examiner, Lisa Beck, completed an RFC assessment for Viveiros. Beck reviewed Viveiros's medical history and found that he could engage in light work. (Tr. 18). Specifically, Beck found that Viveiros was capable of lifting up to 20 pounds occasionally and ten pounds frequently. (Tr. 232). She determined that Viveiros could walk or stand for about six hours during an eight-hour workday and sit for about six hours during an eight-hour workday. She determined that he had an unlimited ability to push and pull.

-6-

She noted that Viveiros had postural limitations which allowed him to only occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 233).

E. **Hearing before ALJ**

On August 23, 2001, Viveiros appeared before ALJ Hoban. Viveiros testified that he had to constantly reposition himself because he could not sit still for long periods of time due to knee and back pain. After sitting for a long period of time, his back would begin to spasm. He further testified that he could drive, but must pull over every 15 to 20 minutes to "position [him]self." (Tr. 34). Viveiros indicated that he took pain and anti-inflammatory medications. He also stated that he could sit for only two to three hours during an eight-hour work day and that he needed to lie down for two to three hours a day in half-hour increments. Viveiros testified that he "tr[ied] to walk outside [his] house" for exercise. (Tr. 53).

The ALJ asked vocational expert ("VE") James Parker if there were any jobs available in the national economy for a 35 year-old

person who had a tenth grade education and only heavy work experience. Parker listed a series of jobs at the light work level. The ALJ asked Parker to identify sedentary jobs meeting the same requirements and Parker responded that there were three job descriptions meeting the stated requirements. The ALJ then asked Parker to assume that a person was not capable of the required six hours of standing and had to adjust positions between standing and sitting. Parker responded that two sedentary positions remained: an automobile locater and a water clerk, food and beverage, both of which existed in the New Hampshire and Vermont area. The ALJ did not ask Parker to discuss whether non-exertional limitations such as limited reaching, pushing and pulling, climbing, balancing, kneeling, crouching, crawling, and stooping would impact the available sedentary jobs.

The ALJ found Dr. Spina's medical records vague and contradictory. The ALJ ordered an orthopedic evaluation and held the record open in the interim. He then informed Viveiros that he would find that Viveiros was not capable of performing sedentary work if the orthopedic consultant supported that conclusion.

On October 15, 2001, Viveiros was examined by orthopedist John Lambrukos, M.D. Viveiros described his sitting and standing limitations to Dr. Lambrukos. After observing Viveiros sitting for approximately a half-hour, Dr. Lambrukos opined that Viveiros must avoid: extended periods of standing or walking; prolonged riding or driving in motor vehicles; bending; squatting; kneeling; climbing; and heavy lifting. Dr. Lambrukos opined that Viveiros could occasionally lift more than ten pounds and frequently lift less than ten pounds. He determined that Viveiros could stand or walk for less than two hours during an eight-hour workday. Dr. Lambrukos found that Viveiros had a limited ability to sit for less than six hours during an eight-hour workday and must periodically alternate sitting and standing to relieve pain or discomfort. In addition, Dr. Lambrukos found that Viveiros could not climb, balance, kneel, or crawl. Dr. Lambrukos also indicated that Viveiros could occasionally reach in all directions.

## F. **ALJ Determination**

The ALJ applied the five-step sequential evaluation process

under which SSI applications are reviewed.[4]  See 20 C.F.R. §
416.920 (2002).  He found that Viveiros had carried his burden
through step four of the process as to his knee condition.  He
found, however, that Viveiros's back problems were not "severe"
and therefore halted analysis of his back injury at step two.  At
step five, the ALJ found that Viveiros was capable of working at
jobs existing in significant numbers in the national economy.
The ALJ determined that although Viveiros was generally credible,
his testimony did not support a finding of total disability.
Instead, the ALJ determined that Viveiros was capable of working
in a sedentary job which allowed him to exercise "the stand/sit
option."  (Tr. 17).  The ALJ then applied the Medical-Vocational
Guidelines (the "Grid"), relied on the VE's testimony and found
that Viveiros was not disabled as defined by the Act.

---

[4]  The five-step evaluation process requires the ALJ adhere
to the following sequential analysis: (1) whether the claimant is
performing substantial gainful activity; (2) whether the claimant
has a severe impairment; (3) whether the impairment meets or
equals a listed impairment; (4) whether the impairment prevents
the claimant from performing past relevant work; and (5) whether
the claimant is capable of performing any work that exists in
significant numbers in the national economy.  See 20 C.F.R. §
416.920 (2002).

## II. **STANDARD OF REVIEW**

After a final determination by the Commissioner denying a claimant's application for benefits and upon a timely request by the claimant, this court is authorized to review the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the Commissioner's decision. See 42 U.S.C. § 405(g). The court's review is limited in scope, however, as the Commissioner's factual findings are conclusive only if they are supported by substantial evidence. See id.; Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). The Commissioner is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. See Irlanda Ortiz, 955 F.2d at 769; Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); see also Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 535 (1st Cir. 1988). Therefore, the court must "'uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.'" Irlanda Ortiz, 955 F.2d at 769

(quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

While the ALJ's findings of fact are conclusive when supported by substantial evidence, they "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Charter, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citations omitted). If the Commissioner has misapplied the law or has failed to provide a fair hearing, deference to the Commissioner's decision is not appropriate, and remand for further development of the record may be necessary. See Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 644 (2d Cir. 1983); see also Slessinger v. Sec'y of Health & Human Servs., 835 F.2d 937, 939 (1st Cir. 1987) ("The [Commissioner's] conclusions of law are reviewable by this court.") I apply these standards in reviewing the issues Johnson raises on appeal.

## III. ANALYSIS

Viveiros contends, among other things, that the ALJ improperly ignored non-exertional limitations in posing

hypothetical questions to the VE at the August 23, 2001 hearing. As a result, Viveiros argues, the ALJ could not rely on the VE's testimony that at least two jobs existed in the national economy at the sedentary level that Viveiros was capable of performing.

At step five in the sequential evaluation process, the Commissioner has the burden of demonstrating that Viveiros has the RFC to work in a job that appears in significant numbers in the relevant economy. See Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001); Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982); see also 20 C.F.R. § 416.920. In order for the Commissioner to meet her burden of proof where both exertional and significant non-exertional limitations exist, she must look to evidence outside the Grid. See Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989). In such cases, she can rely on the testimony of a VE to meet her step five burden of proof. See Arocho, 670 F.2d at 375; Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 429-430 (1st Cir. 1991) (per curiam). In order to properly rely on a VE's testimony, however, the ALJ must pose hypothetical questions to the VE that correspond to the claimant's functional

-13-

limitations as evidenced by medical authorities and testimony. See Berrios Lopez, 950 F.2d at 429; see also Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994). An ALJ may only credit the VE's response to hypothetical questions if there is "substantial evidence in the record to support the description of [the] claimant's impairments given to the ALJ's hypothetical to the VE." Berrios Lopez, 950 F.2d at 429; see Rose, 34 F.3d at 19.

The ALJ asked the VE to identify light duty jobs that would be available to a younger person with a tenth grade education, functional literacy, and only unskilled heavy labor work experience. The VE identified several jobs. The ALJ then asked the VE to identify any sedentary jobs with the same restrictions. The VE identified three jobs: automobile locater; water clerk, food and beverage; and jewelry assembler. The ALJ then added:

> Assuming a person couldn't do the walking contemplated
> by light or the standing, well, let's limit it to
> walking. . . . Assume this individual would need to
> work at a workstation and would need to alternate
> positions hourly between standing and sitting. But
> otherwise could do everything else the [DDS] said in
> that assessment, how would that affect the jobs you've
> just described?

In response, the ALJ noted that only two light jobs would exist and of the sedentary positions identified, only the clerk and

-14-

automobile locater positions remained feasible.

The ALJ then asked:

If we take into account the testimony and your observations vocationally, could an individual who has described the imitations that Mr. Viveiros has done today perform any of the jobs you've identified?

The VE responded:

Your honor, based on the testimony today, there is indication of a need to lay down four to six times a day. . . . And in my professional opinion, that would rule out all employment. (Tr. 60)

The ALJ ultimately concluded that Viveiros was capable of performing the sedentary jobs listed by the VE. Viveiros contends that certain non-exertional limitations, specifically his postural limitations noted by the DDS report and subsequently in Dr. Lambrukos's report, were not included in the hypothetical question posed by the ALJ to the VE. Viveiros also contends that the pull and push limitations that Dr. Lambrukos identified also should have been included in the hypothetical.

The ALJ determined that Viveiros did not suffer from any of the upper extremity limitations identified by Dr. Lambrukos, as none were presented to him at the hearing or elsewhere in the medical evidence. The ALJ did not, however, discredit findings

-15-

by both DDS and Dr. Lambrukos that Viveiros suffered from postural limitations.  In addition, the ALJ did not include any of the non-exertional postural limitations in the hypothetical questions he posed to the VE.  The DDS report explicitly included restrictions on Viveiros's ability to climb, balance, stoop, kneel, crouch, and crawl.  Furthermore, there is evidence in the medical record to support such limitations, especially that of crouching and balancing.  The ALJ should have asked the VE if the two jobs identified in the sedentary work category with the stand/sit option would still be viable with the balance and stooping restrictions both DDS and the medical record support.  Although Social Security Ruling ("SSR") 96-9p states that postural limitations do not usually erode the occupational base for sedentary work, it also states that restrictions in "balancing" and "stooping" may significantly erode the sedentary work base.  The ALJ should have provided this information to the VE to determine if Viveiros's balancing and stooping restrictions further eroded the sedentary work base so as to preclude him from working in the two identified sedentary jobs.

Furthermore, even if the ALJ could not address the postural limitations during the August 23, 2000 hearing, he should have

posed the question to the VE at a supplemental hearing after the orthopedic consultation by Dr. Lambrukos clearly indicated a total restriction on all climbing, balancing, kneeling, crawling and stooping. SSR 96-9p explicitly provides that "consultation with vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping." SSR 96-9p. A supplemental hearing would have allowed the VE to take the additional balancing and stooping restrictions into consideration. As such, I find the ALJ's reliance on the VE's testimony was not proper. See Rose, 34 F.3d at 19; Berrios Lopez, 951 F.2d at 429. Accordingly, the ALJ's decision was not based on substantial evidence.

## IV. CONCLUSION

For the forgoing reasons, Viveiros's motion to reverse the decision of the Commissioner is granted. (Doc. No. 12). The Commissioner's motion for order affirming the Commissioner is denied. (Doc. No. 14). The case is remanded for further proceedings. The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

April 5, 2003

cc:  Francis M. Jackson, Esq.
     David L. Broderick, Esq.
     Dennis G. Bezanson, Esq.